## NATIONAL LABOR RELATIONS BOARD v. BOTANY WORSTED MILLS.

## BOTANY WORSTED MILLS v. NATIONAL LABOR RELATIONS BOARD.

### Nos. 8132, 8133.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 18, 1942.

Decided Jan. 18, 1943.

Howard Lichtenstein, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, Joseph B. Robison, and Armin Uhler, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for National Labor Relations Board.

Frederiç R. Sanborn, of New York City (Putney, Twombly & Hall and William C. Treanor, all of New York City, on the brief), for Botany Worsted Mills.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This case is before the Court upon petition of the National Labor Relations Board for enforcement of its order against the Botany Worsted Mills and upon petition by the latter to set aside the order of the Board.

On March 8 and June 25, 1940, the Textile Workers Union of America filed with the Board's Regional Director petitions for investigation and certification of representatives at Botany's plant at Passaic, New Jersey. The Board conducted the appropriate proceedings and on October 7, 1940, issued a decision and direction of election and subsequently on December 13, 1940, a certification in which it found that the union represented a majority of the employees in a unit appropriate for the purpose of collective bargaining. There-

after, upon charges filed by the union, the Board issued its complaint against respondent alleging that it had engaged in and was engaging in unfair labor practices affecting commerce within the meaning of §§ 8(1) (5) and 2(6) (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(1, 5), 152(6, 7). After requisite proceedings under § 10 of the Act, 29 U.S.C.A. § 160, were had, the Board, on May 25, 1942, issued its findings of fact, conclusions of law and an order requiring respondent to bargain collectively with the union. The Board thereafter petitioned this Court to enforce its order and Botany petitioned to set it aside, moving to consolidate the petitions and for leave to adduce additional evidence.

### Jurisdiction.

The first point made by Botany is that there has been a failure to show that the Board had jurisdiction over it. This contention is clearly without merit.

The complaint, after stating that Botany Worsted Mills is a New Jersey corporation engaged in that state in the manufacture, sale and distribution of woolen and worsted products, alleged that a substantial amount of the material and products used in its business were transported in interstate commerce from and through the States of the United States, other than the State of New Jersey, to the Passaic plant and that a substantial amount of the products manufactured by Botany were sold to be delivered in interstate commerce from the Passaic plant. These allegations were not denied. Under Article II, § 10 of the Rules and Regulations of the Board, promulgated pursuant to Congressional authority under § 6 (a) of the Act, 29 U.S.C.A. § 156, an allegation in a complaint not specifically denied in the answer is deemed admitted and may be so found by the Board. Botany contends that the allegations are legal conclusions and do not have to be denied. We do not agree. We think these allegations state facts as to the receipt of material by Botany, for manufacture, from sources outside New Jersey and facts that the manufactured products are shipped to points outside that State.

Furthermore, a similar finding had been made by the Board in the representation proceeding. It was founded upon a stipulation between the parties relative to the first six months of 1940 which stated that during that period Botany had purchased 5,000,000 pounds of raw material, substantially all of which was shipped to it from points outside the State of New Jersey and that it had sold approximately 1,500,000 pounds of finished products, approximately 95% of which Botany shipped f. o. b., from Passaic, New Jersey, to points outside the State of New Jersey. Botany maintains that this stipulation is not available in this proceeding since, when made, it had been limited to the representation proceeding alone. We think the representation and the complaint proceedings cannot be so separated. The provisions of § 9(d) of the Act, 29 U.S.C.A. § 159(d),[1] indicate the contrary. As the Supreme Court said in an analogous situation in Pittsburgh Plate Glass Co. v. National Labor Relations Board, 1941, 313 U.S. 146, 158, 61 S.Ct. 908, 915, 85 L.Ed. 1251, "The unit proceeding and this complaint on unfair labor practices are really one."

Either of these answers is sufficient to establish the Board's jurisdiction. It is well settled, of course, that its power is not limited to cases where actual industrial conflict has already begun. National Labor Relations Board v. Bradford Dyeing Association, 1940, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226.

### Bargaining Unit.

Botany complains of the size of the unit chosen. It consists solely of persons designated as sorters or trappers in the Passaic plant. The Board found that the company employed in that plant 5000 workers.[2] At the time of the election only 32

---

[1] "Whenever an order of the Board made pursuant to section 10(c) [section 160(c) of this title] is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section, and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsections 10(e) or 10(f) [sections 160(e) or 160(f) of this title], and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript."

[2] Respondent asserted in the complaint proceeding and in its brief on appeal that the number has risen to 6500.

employees were in the unit designated as appropriate.

■ It must be borne in mind that the selection of the appropriate unit under the statute is vested in the Board. § 9(b). If the determination is not arbitrary or capricious it is not to be set aside. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 1940, 113 F.2d 698, 701, affirmed 1941, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251. This Court did veto the Board's designation in National Labor Relations Board v. Delaware-New Jersey Ferry Co., 3 Cir., 1942, 128 F.2d 130, because we felt that the public interest had not received sufficient consideration. However, we still recognize fully that the choice of the appropriate unit is, within the area designated by the statute, one for the expert judgment of the Board.

■ Objections raised to the Board's designation are several in number. One is that the provision of the Act (§ 9(b) is unconstitutional because it lacks sufficient standards for the Board's guidance. This question of law we think has been settled by the Supreme Court in the Pittsburgh Plate Glass Co., case, cited above, adversely to the contention of Botany. Another objection is that of convenience and impracticality because it would be impossible to bargain with so large a number of small groups. This point is answered by language used by the Board in another case.[3] "The respondent does not consider it impractical to bargain with every single employee separately; it is surely no more impractical to bargain collectively with a group of 13 as a unit."

■ Again, the choice of the unit is attacked because of an alleged absence of testimony, in the representation proceeding, signifying the desires of the employees concerned. Their desire is admittedly one of the factors in determining an appropriate unit. Pittsburgh Plate Glass Co. v. National Labor Relations Board, supra. But there was evidence of this desire on the part of employees before the Board. There was an election held under Board auspices in which the choice of the union was manifested by a majority of those entitled to vote, and they were the sorters and trappers only.[4] At this election the question of representation by a named union was categorically put to the voters.

Another objection is based upon the action of the Board in Matter of Arlington Mills, 1941, 31 N.L.R.B. 21. It is contended that the action in that case was inconsistent with what the Board has done in the case now before us and that such inconsistency, ipso facto, constitutes arbitrary or capricious action. Even if the legal conclusion were accepted as sound, we think the facts of the Arlington case were different. (1) There were two competing unions proposing different units one of which included approximately 58 employees, the other, approximately 1800 out of a total of 6500. (2) Both unions were engaged in extensive organizational campaigns covering the entire plant and admitted that a plant wide unit was most appropriate. (3) A substantial number (1000) of the employees who were neither sorters nor trappers were union members.

The Board in its opinion approving this unit considered significant the extent of organization for collective bargaining among Botany's employees. The evidence before the Board showed that at the time a majority of the sorter-trapper group manifested its desire for collective bargaining through union membership, the majority of the other employees of Botany did not belong to any union and that no labor organization had petitioned the Board for certification as the representative of the employees on a plant wide basis. The Board expressed the belief that the rights of the unit selected as appropriate should not have to be contingent upon what other employees in other parts of the plant did. There was evidence indicating that the unit designated was sufficiently distinct from other groups of employees so as to make its selection as a separate unit feasible. The sorters or trappers work in a part of the plant entirely or partly set apart for the process in which they are engaged and this department has its own supervisors. There is no interchange of employees engaged in sorting or trapping, except to the extent that when the process

---

3 The Warfield Co., 1938, 6 N.L.R.B. 58, 64.

4 In December, 1939, Botany employed at the Passaic plant approximately 48 workers designated as sorters or trappers. At that time the principal process was sorting. There was a change of process made later which brought about a reduction of the employees in this department to 32, the number at the time of the election.

was changed 12 former sorters were transferred to other departments. We do not see any basis upon which the designation of the bargaining unit by the Board in this case should be interfered with by this Court.

### Matters Subsequent to Election.

An election was held pursuant to the direction of the Board on November 8, 1940. The form of ballot used in the election was:

"Do you desire to be represented for the purposes of collective bargaining by Textile Workers Union of America, affiliated with the Congress of Industrial Organizations?

"YES NO"

Election results were reported on November 12, 1940. The union was duly certified as the representative of the workers on December 13, 1940.

It is not seriously denied by Botany that it refused to bargain with this union as a representative of the group of employees designated as the appropriate bargaining unit by the Board. In any event, there is ample evidence to support the conclusion that there was such refusal. The main point made by Botany is that it was under no obligation to accept the union as a bargaining representative because of the following facts:

Two letters, purportedly signed by 20 of the 32 employees who had chosen the union as their representative in the election, were addressed to the president of the company bearing date of November 15, 1940. This, it will be remembered, was just one week after the election. The letters stated "A goodly percentage of we wool sorters and trappers do not think being members of the C. I. O. will benefit us or our fellow workers and therefor do not wish to join that organization.", and requested a conference. The letters were received by Botany on November 15, 1940, but the allegation that the union had lost its majority status was not made by the employer until March 7, 1941. The legal question of the significance of this communication was raised previously by Botany in its answer in the complaint proceeding and by motion to adduce additional evidence in this Court. Assuming the genuineness of the letters in every respect and the fact that they were the unsolicited action of the employees signing them, of which there is no evidence to the contrary, do such communications excuse the employer from refusing to bargain with a certified appropriate unit? Attack has been made on the timeliness of the defense raised by the employer since it held the information without disclosure to the Board from November to March, although during that time it had asked the Board to reargue the case and set aside its decision. We think the real issue, however, is broader.

In Oughton v. National Labor Relations Board, 3 Cir., 1941, 118 F.2d 486, certiorari denied, 1942, 315 U.S. 797, 62 S.Ct. 485, 86 L.Ed. 1198, this Court held that the majority status of the bargaining agent, as determined by an election ordered by the Board, presumptively continued. That case is not exactly in point here, however, for there were, therein, other unfair contemporaneous labor practices by the respondent in addition to refusing to bargain with the certified unit.

Botany here contends that the rights of the employees under the Act entitle them to choose their bargaining agent, but like any other agent the authority may be terminated at the wish of the principal. In no other way, it says, can the rights of the employees under the Act be realized. There can be, the argument runs, no length of time in which an employee is bound by the choice expressed in an election. If he, and his fellows, change their minds the next day the choice manifested in the election is revoked and it is the Board's duty under the Act to give effect to the new choice, not the one manifested in the election.

The argument, while containing some elements of plausibility, would, if accepted, make chaos out of the administration of the statute and prevent the protection of the very rights which it aimed to secure. Litigants in all law suits are entitled to their rights under the law, but they must work them out in orderly fashion according to rule. The Board was empowered by the statute to make rules and regulations for its procedure for the same reason. The Board has within its authority power to ascertain the will of the majority of a given group of employees by election or other means. The election method is chosen, we take it, because secret ballot is regarded as the most effective way of getting an untrammeled expression of the desire of the electorate. Surely it is not to be defeated of all its effectiveness by a communication, undisclosed to the

Board, repudiating, immediately after the election was held, the ballot count. The employees in this case, if they wished to change their minds concerning a bargaining agent, could have asked the Board for another election. If the Board had arbitrarily refused it within a reasonable time then we might have a case where a question could be raised whether it had done its duty under the statute. But those are not the facts of this case. We conclude that there is no merit in Botany's contention that the Board erred in its order that the employer must bargain with the certified bargaining agent.

## Due Process of Law.

 Botany complains that throughout the proceeding it was denied a fair hearing and due process of law. This involves both the representation proceeding and the complaint proceeding. With regard to the latter, it is contended that the then trial examiner showed that he was incapable of affording the respondent a fair hearing because, in the course thereof, he declared several times that he was "an agent of the Board's." As a matter of fact, the Board's Rules and Regulations define a trial examiner, among others, as an agent of the Board.[5] Moreover, when read in their context in the transcript, as we have read them, the statements made by the trial examiner and objected to so strenuously by Botany merely refer to the fact that the trial examiner was bound by prior rulings of the Board upon the very case in hand. There was no impropriety in this.

The objections to the exclusion of certain evidence and the refusal to issue subpœnas by the trial examiner had to do with points already covered in this opinion, namely, the designation of the appropriate bargaining unit and the alleged revocation of the union's majority status. In the view we take of the case there was no error in these rulings. The same applies to the refusal to receive the entire record in the Arlington Mills case referred to previously. Even if that case were controlling, as it is not, it is in the official records of the National Labor Relations Board and did not need to be introduced into evidence.

It is also contended that due process was violated since the lawyer who served as trial examiner in the representation proceeding had previously been employed as a trial attorney of the Labor Board in the Regional office for the Second Region and in that capacity had conducted the preliminary investigation prior to the hearing. This, it is contended, necessarily establishes bias on the part of the trial examiner and the conclusion drawn is that bias by the trial examiner necessarily deprives one involved in the "litigation" of due process of law.

 In the first place this argument presses too far the analogy between the representation proceeding and a trial at law. The preliminary investigation and the hearing in the representation proceeding are not contentious litigation; not even litigation, but investigation. It is made on behalf of the Board by members of its staff. The outcome is merely a certification of a bargaining representative.

 Furthermore, the trend of the whole argument presses too hard the analogy between trial examiner and Board and trial court and appellate court. It is the Board, not the trial examiner, which is charged by the Act with both the power and responsibility of making findings of fact and the decisions thereon. §§ 9 and 10. The trial examiner is the agent of the Board who gathers facts and, in a complaint proceeding, makes findings and recommendations presented to the Board as an intermediate report.[6] Unlike judges, trial examiners may be substituted at the will of the Board during the course of either representation or complaint proceedings.[7] In both the representation and complaint proceedings all the pleadings, notices, rulings, orders, stenographic records, exhibits, documents and depositions constitute the record before the Board.[8] The trial examiner's intermediate report is merely advisory and the Board may accept or reject it.[9] Indeed, the latest commentators upon the subject have said that the report of the trial examiner "is to be regarded as in the nature of an 'inter-office memorandum,' whose presence or ab-

[5] Rules and Regulations, Art. IV, § 2.

[6] Rules and Regulations, Art. II, § 32.

[7] Rules and Regulations, Art. II, § 23; Art. III, § 5.

[8] Rules and Regulations, Art. II, § 32; Art. III, § 7.

[9] National Labor Relations Board v. Elkland Leather Co., Inc., 3 Cir., 1940, 114 F.2d 221, 225, certiorari denied, 1940, 311 U.S. 705, 61 S.Ct. 170, 85 L. Ed. 457. See National Labor Relations Board v. Air Associates, Inc., 2 Cir., 1941, 121 F.2d 586.

sence does not or should not affect the result of the case being determined by the agency tribunal." Pike and Fischer, Administrative Law, § 63a.16.[10] It is the Board, therefore, which has the final responsibility both under the terms of the statute and the decisions of the courts construing and applying it. The whole record is before it; it may produce additional testimony when it deems it necessary. If bias is charged against it or one of its members, a different problem arises and this court has, in the past, taken action it deemed appropriate under the circumstances.[11] No such complaint is made in this case. When the true relation of investigation and other preliminary proceedings to the authoritative order of the Board is thus made clear, the conclusion is inevitable that there was in the operation of the routine process in this case nothing of which complaint could fairly be made as lacking due process.

### The Order.

 Botany objects to the conclusion of the Board which states that it coerced its employees in the exercise of the rights guaranteed under § 7 of the Act. While we find no showing of coercion by the employer nor any attempt to show it in the argument before this Court, we do not find in the Board's order anything based on the alleged coercion. The unfair labor practice charged is refusal to bargain and the record supports the finding to that effect. An order which requires the employer to refrain from interfering with the efforts of the accredited representative to bargain collectively does not exceed the permissible bounds of an order under the Act. National Labor Relations Board v. Express Pub. Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. However, for complete clarity we think paragraph 1(b) of the order should include the same limiting clause as that which already appears in paragraphs 1(a) and in 2 so that 1(b) will read: "In any manner interfering with the efforts of Textile Workers Union of America, affiliated with the Congress of Industrial Organizations, as the exclusive representative of all wool sorters or trappers, including overlookers, at the Passaic plant of respondent, to bargain collectively with the respondent."

The petition of the Board will be granted with this modification; the petition of respondent to set aside the Board's order is denied; likewise the motion to adduce additional testimony.

---

[10] Reference should also be made to the same text, § 41d.53.

[11] Berkshire Employees Ass'n of Berkshire Knitting Mills v. National Labor Relations Board, 3 Cir., 1941, 121 F.2d 235.